**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| **MICHAEL CARTER,** **Individually and on behalf of the Sig Sauer, Inc. 401(k) Plan, and on behalf of all the similarly situated participants and beneficiaries of the plan,** **Plaintiff,** **v.** **SIG SAUER, INC.; THE SIG SAUER, INC. 401(k) COMMITTEE.** **John and Jane Does 1-30 in their capacities as fiduciaries and members of the Committee,** **Defendants.** | **Case No.  1:26-cv-00098-SM-TSM** **JURY TRIAL DEMANDED** |

## FIRST AMENDED CLASS ACTION COMPLAINT

1.      Plaintiff Michael Carter, individually, and on behalf of all other similarly situated participants, their beneficiaries and estates, and on behalf of Sig Sauer, Inc. 401(k) Plan ("the Plan"), brings this action under 29 U.S.C. §§ 1132(a) (2) and (3) against Defendants (1) Sig Sauer, Inc., ("Sig Sauer"), (2) Sig Sauer, Inc., 401(k) Committee ("Committee"), and (3) John Does and Jane Does 1-30 in their capacities as fiduciaries and members of the Committee (collectively, "Defendants" or "Fiduciaries"), to remedy Defendants' breaches of fiduciary duties and other violations of the Employee Retirement Income Security Act of 1974, as amended (ERISA), 29 U.S.C. § 1001, *et seq*.

2.      Defined contribution plans that are qualified as tax-deferred vehicles have become the primary form of retirement savings in the United States and, as a result, America's *de facto* retirement system. Unlike traditional defined benefit retirement plans, in which the employer

typically promises a calculable benefit and assumes the risk with respect to high fees or under-performance of pension plan assets used to fund defined benefits, defined contribution plans operate in a manner by which participants bear the risk of high fees and investment underperformance.

3.     As fiduciaries to the Plan, Defendants were obligated at all times to act prudently and for the exclusive benefit of participants and beneficiaries. Defendants violated their fiduciary duties in connection with the Plan's single most important investment decision: the selection and retention of its target date fund series—the default investment in which the majority of participants' retirement savings were concentrated. For more than eight years, Defendants retained the American Century One Choice Target Date Fund series ("AC TDF"), which comprised over 65% of Plan assets, despite its persistent and dramatic underperformance, while failing to follow any prudent process for evaluating or monitoring this critical investment. The Committee's own Investment Policy Statement ("IPS") established a scoring framework that was applied to every other fund in the Plan: funds scoring below threshold were placed on a watch list, escalated to "Decision Needed" status after persistent failure, and ultimately replaced. But the Committee never applied this framework to the AC TDF. The Committee's quarterly investment reports contained all the data necessary to score the AC TDFs under the IPS criteria, and when those scores are computed, most AC TDF vintages fail in most quarters. Funds with higher scores than the AC TDFs were placed on the watch list and replaced. The AC TDFs, holding the majority of Plan assets as the Plan's Qualified Default Investment Alternative, were simply exempt from scrutiny. Plan participants paid the price: millions of dollars in diminished retirement savings.

4.     Plaintiff brings this action to obtain the relief provided under 29 U.S.C. § 1109, for losses suffered by the Plan resulting from the Defendants' fiduciary breaches described below, and

for other appropriate equitable and injunctive relief under 29 U.S.C. § 1132(a)(2) and (3), including relief to remedy the Defendants' failure to maintain a prudent process for selecting, evaluating, and monitoring the Plan's target date fund investments.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to 29 U.S.C. § 1331 and 29 U.S.C. § 1132(a).

6.      Venue is proper in this judicial district pursuant to 29 U.S.C. § 1132(e)(2) because Defendant Sig Sauer resides in this District.

## THE PLAN

7.      The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A), a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34), and a qualified plan under 26 U.S.C. § 401(k).

8.      The Plan was established to provide eligible employees with the opportunity to accumulate retirement savings over a long period through the sum of employee and employer contributions and associated investment earnings minus associated expenses.

9.      The Plan is a defined contribution plan covering all eligible employees of Sig Sauer and participating subsidiaries. Participants of the Plan can elect to make tax-deferred contributions upon eligibility.

10.     The Defendants control and manage the operation and administration of the Plan. The Defendants have fiduciary responsibility for the investment of the assets of the Plan.

11.     The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974 (ERISA).

12.    At all relevant times throughout the class period, the Plan was larger than 99% of all defined contribution plans and was considered a large plan, such that Plan fiduciaries should have had significant leverage to negotiate the lowest fee rates for investments and administrative expenses. The Plan Sponsor managed over $100 million in Plan assets from 2020 to 2024 for over 3,000 active participants depending on the year.

## THE PARTIES

13.    At relevant times, Plaintiff Michael Carter by virtue of his former employment with Sig Sauer and participation in the Plan, is or may become eligible to receive additional benefits under the Plan as a result of Defendants' breaches of fiduciary duty and ERISA violations.

14.    Thus, Plaintiff Carter is a participant as defined by ERISA § 3(7), 29 U.S.C. § 1002(7).

15.    At relevant times during the Class Period, Plaintiff Carter was invested in the American Century One Choice target date fund series.

16.    As a result of the Defendants' mismanagement of the Plan and violations of ERISA, Plaintiff Carter was subject to underperformance and suffered financial losses.

17.    At all relevant times, Defendant Sig Sauer, Inc., was and is incorporated in New Hampshire with its principal office located at 72 Pease Boulevard, Newington, New Hampshire. Sig Sauer is a company with over 3,000 employees.

18.    At all relevant times Sig Sauer was and is the named fiduciary and sponsor of the Plan per 29 U.S.C. § 1002(16)(B) and 29 U.S.C. § 1002(a); a party in interest under 29 U.S.C. § 1002(14)(C); and a Plan fiduciary under 29 U.S.C. § 1002(21)(A), to the extent that it appointed members of the Committee and fiduciaries and otherwise exercised discretion over the administration and management of the Plan and/or control of Plan assets.

19.    At all relevant times, one or more of the Defendants was the Plan administrator under 29 U.S.C. § 1002(16); a party in interest under 29 U.S.C. § 1002(14)(A); and Plan fiduciary under 29 U.S.C. § 1002(21)(A), to the extent that it had or exercised discretion over the administration or management of the Plan and/or control of Plan assets, as well as a named fiduciary.

20.    At all relevant times, Defendants John and Jane Does 1-30, as fiduciaries and members of the Committee, were fiduciaries of the Plan under 29 U.S.C. § 1002(21)(A), to the extent that they had or exercised discretionary authority respecting the administration or management of the Plan, and/or control of Plan assets. Plaintiff will seek leave to amend the Complaint to name each of these John Does once they ascertain their identities in discovery.

21.    Sig Sauer, the Committee, and John and Jane Does 1-30 are hereinafter referred to as the "Defendants" or "Fiduciaries".

## DEFENDANTS' FIDUCIARY OBLIGATIONS

22.    ERISA imposes strict fiduciary duties upon the Defendants as fiduciaries of the Plan, including the duty of prudence. These duties apply to all fiduciary acts, including the Sig Sauer Defendants' selection and retention of investment options for the Plan.

23.    ERISA's duty of prudence requires fiduciaries to discharge their responsibilities "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters would use." 29 U.S.C. §1104(a)(1)(B). The test of prudence "is one of conduct, and not a test of the result of performance of the investment." *Barchock v. CVS Health Corp.*, 886 F.3d 43, 45 (1st Cir. 2018) (quoting *Bunch v. W.R. Grace & Co.*, 555 F.3d 1, 7 (1st Cir. 2009)). Accordingly, fiduciaries must vigorously and independently investigate each of the Plan's investment options with the skill of a prudent investor. *See Donovan v. Bierwirth*, 680 F.2d 263,

5

272 (2d Cir. 1982). This includes conducting meaningful evaluations of whether the Plan's investment options remain prudent compared to available alternatives.

24.    As part of its fiduciary duty, the Sig Sauer Defendants "ha[ve] a continuing duty to monitor [Plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015). "A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Id*. at 530. If an investment is imprudent, Sig Sauer "must dispose of it within a reasonable time." *Id*. (citation omitted).

25.    ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. The statute states, in relevant part, that: In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or (2) if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

26.    Under 29 U.S.C. § 1132(a)(2), a plan participant is authorized to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109. Section 1109(a) provides in relevant part: Any person who is a fiduciary with respect to a plan who breaches any

6

of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## FACTUAL ALLEGATIONS

### I. Defendants Violated ERISA's Fiduciary Duty of Prudence.

#### A. *Background on Target Date Funds*

27.     In a recent report to Congress, the U.S. Government Accountability Office ("GAO") noted that Target date funds (TDFs) are widely offered and have become the most popular investment option used by 401(k) plan participants. TDFs allocate assets over time based on participants' targeted retirement dates. Plan sponsors often choose TDFs as their default investment because TDFs offer a "set it and forget it" option for participants.

28.     The investment objective of a target date fund series is to provide an asset allocation strategy that changes its asset allocation over time as investors get closer to their expected retirement date. The name of each fund in a target date series typically refers to its target date, which corresponds approximately to the investor's anticipated retirement date. For example, a fund with a name like "Retirement Fund 2040" or "Target 2040" is designed for individuals who intend to retire in or near the year 2040. Target retirement years are often offered in five-year increments. The specific retirement date of a fund in a target date series is often referred to as a "vintage." For example, funds in a target date fund series for plan participants expected to retire around 2040 would typically be referred to as the 2040 vintage of that series while the fund in a target date fund

series for plan participants expected to retire around 2030 would typically be referred to as the 2030 vintage target for that specific target date fund series.

29.     Like most target-date fund series, the American Century One Choice target date fund series (hereafter "AC TDF"), is structured as a "fund of funds," which means that each vintage invests in other American Century proprietary funds rather than individual securities. For example, each vintage in the AC TDF may be invested in differing proportions of proprietary AC equity funds, bond funds, real estate funds, and money market funds. In other words, each vintage of the AC TDF invests in a combination of proprietary AC mutual funds to provide varying exposure to a mix of asset classes such as U.S. stocks (large-caps and small-caps), international stocks, U.S. bonds, international bonds, investments linked to real estate, and cash-equivalent securities.

30.     Each equity allocation is intended to provide exposure to a specific market segment. Typically, those segments include U.S. large-, mid- and small-capitalization companies and international (non-U.S.) developed and emerging markets. The portfolio manager's aim should be to build a portfolio that provides exposure to factors commonly tied to a stock's potential for enhanced risk-adjusted returns relative to the market.

31.     The fixed income allocation is intended to provide diversified exposure across a wide range of market sectors, including U.S. government obligations, corporate investment grade and below investment grade bonds (commonly known as "high yield bonds" or "junk bonds"), other U.S. aggregate bond sectors (including mortgage- and asset backed securities), and emerging market and international fixed income issues. The portfolio manager's aim is to provide broadly diversified fixed income exposure and construct a portfolio to enhance issuer diversification and liquidity.

32.     Under ERISA, the asset allocation for each vintage of a target date fund series must be consistent with the prudent investor standard which incorporates Modern Portfolio Theory.

33.     TDFs seek to achieve their objectives by rebalancing assets over time to become less focused on growth (lowering their allocation to stocks) and more focused on preservation (raising their allocation to bonds) as the fund approaches and passes the target date. The asset mix between equity and fixed income shifts dynamically over time, becoming less risky over a person's working career and into retirement. The transition from higher risk to lower risk is often referred to as the "glide path."

34.     For example, the following graph illustrates Morningstar's calculation of the average glide path over time from 2010 to 2024.



[1]

---

[1] Morningstar 2025 Target-Date Fund Landscape, April 2025, page 24.

35.    TDF glide paths are often categorized as managed either "to" or "through" retirement. In general, historically a "to retirement" glide path generally assumed participants withdraw their funds once they reach the presumed retirement age, or soon thereafter, and tend to have less equity exposure at retirement. Similarly, in general, the asset allocation of a "to retirement" TDF historically remained static once the retirement date is reached. A "through retirement" glide path generally expects participants will remain invested after reaching retirement and gradually draw down on their funds. Accordingly, the terminal allocation of a "through" TDF is not reached until a predetermined number of years after the target date.

36.    However, these distinctions and categorizations are somewhat arbitrary. In fact, for example, some "to" glide paths, like the AC TDF series, have more equity exposure at retirement than some "through" glide paths. Moreover, as illustrated in the Morningstar's graph above, over time most retirement plan asset managers have understood that, under the circumstances prevailing prior to and at the start of the class period as well as now, static asset allocations for plan participants around age 65 are less consistent with Modern Portfolio Theory.

37.    Further, while TDFs are sometimes considered differentiated by whether they consist of index (passive) funds or active funds, in fact all TDFs are actively managed because of the continuous work of shifting the asset allocation of each vintage along the glide path.

38.    Accordingly, as described below in more detail, the minimum standard of care for prudent plan fiduciaries making investment decisions under the prudent investor standard requires a consideration of more than just a "passive" or "to" subset of the available universe when selecting or monitoring target date fund series.

39.    Additionally, while the specific details of glide paths vary somewhat across different TDF series, they are all constrained by Modern Portfolio Theory and, as a result, they all

compete with each other for investment dollars. Over the years, it has become clear that some glide paths are better than others. This is illustrated by the change in the average glide path illustrated above as well as net fund flows out of inferior glide paths and into superior glide paths.

40.    Further, because most plan fiduciaries designate the selected TDF as the qualified default investment alternative ("QDIA") under ERISA, the TDF selected by a plan fiduciary will typically contain the lion's share of the assets of most plan participants. For this reason, the selection of a TDF series as the QDIA by plan fiduciaries is often the most important and impactful of all its investment selection and monitoring responsibilities.

41.    For example, in this case the AC TDF comprised over 65% of the Plan's assets from 2019 through 2024.

42.    Unlike most of the equity and fixed income asset categories that comprise the underlying investments contained in TDFs for which there are often several scores of alternatives, there are far fewer TDF options. For example, in 2024, there were only 37 established TDFs that had a 15-year track record. A closer look reveals that the space is even more concentrated with the Vanguard TDF series having more than double the assets of the next largest TDF series. Moreover, as of the end of 2024, the top 5 largest TDFs have garnered more than 80% of the dollars invested in TDFs.

11



**Mutual Fund + CIT Assets TD Market Share**

| | |
|---|---|
| Vanguard | 36.97% |
| Fidelity | 13.89% |
| T. Rowe Price | 11.46% |
| BlackRock | 9.82% |
| Capital Group | 8.48% |
| Remaining TDFs | 19.38% |

Source: Morningstar Direct and surveyed data. Data as of Dec. 31, 2024.

[2]

43.     The significant market share among the market leaders is primarily the result of investors moving away from clearly inferior TDF products, like the AC TDF chosen by Defendants in this case, and into superior alternatives. The net flow into a particular target date series is the sum of contributions from existing investors, withdrawals from existing investors, and the net result of transfers by fiduciaries from one inferior target date series to a new superior target date series. Investors and plan fiduciaries have been making decisions that indicate they have concluded that the AC TDF is inferior. For instance, in 2024 the AC TDF series experienced net outflows of $3,973,629,580. This represented a loss of more than 19% of its total assets under management. In contrast, for example, the American Funds/Capital Group target date series experienced over $16B in net inflows.

---

[2] Morningstar 2025 Target-Date Fund Landscape, April 2025, page 13.

44.     As noted above, all TDFs compete for selection by plan fiduciaries and are compared against each other despite some slight differences in glide paths. Unlike the mutual fund market, the TDF market is too small and concentrated for plan fiduciaries to fail to compare their selected options against the market leading and established available options. In other words, while there are some differences between, *e.g.*, the T. Rowe Price and Vanguard TDFs, prudent fiduciaries compare and consider these two as well as other options when making their selections and deciding whether to retain or remove a selected TDF series. Further, over time as prudent fiduciaries have continued to evaluate and analyze the differences in the glide paths of TDF series, the superior glide paths have attracted more assets and most TDFs with underperforming glide paths have revised their glide paths to be more like the superior options. In other words, over time the variance between the glide paths of the TDF series have decreased and those that continue to be outliers have experienced underperformance.

**B.  The Standard of Care for Prudent Fiduciaries Selecting and Retaining a TDF Series**

45.     ERISA's fiduciary duty of prudence requires that fiduciaries must act consistent with the prudent investor standard when making decisions related to plan investments. This means that in order to be prudent, fiduciaries are required to follow accepted investment theories and prevailing investment industry practices. *Tibble v. Edison Int'l*, 575 U.S. 523, 529-30 (2015). For the last several decades, the most accepted investment theory is the Modern Portfolio Theory ("MPT") which has been incorporated into the prudent investor standard.

46.     A prudent TDF selection and monitoring process considers a wide array of metrics commonly accepted and incorporated in MPT that allow the fiduciary to properly assess the prudence of any potential TDF series.

47.    A prudent process considers all the metrics and circumstances present at the time of the selection/retention/removal decision in order to evaluate whether the TDF should be selected or retained.

48.    Accordingly, the minimum standard of care for prudent plan fiduciaries selecting and retaining investment options to be made available for plan participants always requires an analysis of the risk-adjusted performance of the selected or retained investment options.

49.    While the selection of a target date series is a bit more complex than the selection of a single-strategy investment option, retirement plan experts have also developed a minimum standard of care with respect to the selection and retention of target date series.

50.    The most critical criteria for selecting and retaining target date fund series are performance, risk (which incorporates risk-adjusted performance), fees, and the "glide path" dynamic asset allocation (also sometimes called "portfolio construction"). These quantitative criteria are also supplemented with some qualitative criteria that are often merely proxies for an increased risk of future underperformance, *e.g.*, a change in the investment manager's ownership or key personnel, a shift in the investment manager's philosophy or process, or the investment manager's involvement in litigation or fraud allegations.[3]

51.    In other words, the qualitative criteria primarily provide reasons to not select (or eliminate) a TDF series from a plan even if performance was good at that moment. At the end of the day, however, risk-adjusted performance is the primary and most important criteria. Even the fees are essentially a proxy for performance because lower fees correlate with higher performance.

---

[3] *See* U.S Gov't Accountability Off. Report to Congressional Requesters, *401(k) Retirement Plans* (March 2024) (Accessible Version), at 50 (p. 56 of PDF). *See also* CAPTRUST, *Best Practices for Target Date Fund Selection*, https://www.captrust.com/wp-content/uploads/2019/05/tdftips.pdf (last visited January 20, 2026); Callan Institute, Defined Contribution Trends Surveys 2017-2020, 2022.

52.     And of course, the actual performance of an investment is the most important criteria to the investor (plan participant) and is accordingly always considered when evaluating a target date series. And because each target date series might incorporate a glide-path that takes on relatively more (or less) risk, the risk-adjusted performance metrics are relatively more important for comparing and benchmarking target date series.

53.     As discussed above, when evaluating the risk-adjusted performance and quality of investment managers, the minimum standard of care for prudent plan fiduciaries requires the incorporation of standard metrics from MPT. The most important of these criteria include, but are not limited to, the following metrics over three- and five-year trailing periods:

- Alpha: "A measure of the difference between a portfolio's actual returns and its expected performance, given its level of risk as measured by beta. A positive Alpha indicates the portfolio has performed better than its beta would predict. In contrast, a negative Alpha indicates the portfolio has underperformed, given the expectation established by beta."

- Sharpe Ratio: "A risk-adjusted returns measure developed by William Sharpe. It is calculated over each [time] period by dividing a fund's annualized excess returns by the standard deviation of a fund's annualized excess returns to determine reward per unit of risk. The Sharpe Ratio can be used to compare two funds directly on how much risk each had to bear to earn excess return over the risk-free rate."[4]

---

[4] Notably American Century identifies the Sharpe Ratio is a meaningful investment metric in its marketing materials. *See* https://www.americancentury.com/advisors/client-conversations/target-date-solutions/one-choice-target-date-portfolios/ (last viewed January 21, 2026).

- Sortino Ratio: "Similar to the Sharpe ratio, the Sortino Ratio (developed by Frank Sortino) uses only the downside risk portion of the standard deviation in the denominator."[5]

54. Some other relevant metrics include the following:

- Information ratio (IR): a metric that helps the investor evaluate whether the manager of the investment is beating a specific benchmark. An IR above 1.0 is evidence of excellent performance with consistent outperformance of the specific benchmark; an IR between 0.5 and 0.99 is evidence of reasonable manager skill; an IR of below 0.5 is evidence of weak performance as compared to the specific benchmark; and a negative value IR is evidence of consistent underperformance relative to the benchmark.

- Batting Average ("BA"): is a measure of a manager's ability to consistently beat the market. It is calculated by dividing the number of months in which the manager beat or matched the fund's primary benchmark index by the total number of months in the period. For example, a manager who meets or outperforms the market every month in a given period would have a batting average of 1.000. A manager who beats the market half of the time would have a batting average of .500.

- Turnover Ratio: is the percentage of a mutual fund or other portfolio holdings that have been replaced in the course of one year. Since a fund with a higher turnover ratio will have higher trading fees and short-term capital gains taxes,

---

[5] United States Government Accountability Office Report to Congressional Requesters, "401(k) Retirement Plans" March 2024, Accessible Version, page 70-71 of the Report (76-77 of the pdf).

16

a portfolio manager with a higher turnover ratio will need to ensure that those trades are generating positive returns in excess of the additional costs.

55. Additionally, the minimum standard of care for prudent plan fiduciaries selecting and retaining target date series requires a comparison of the risk-adjusted performance. In other words, to satisfy the minimum standard of care under the circumstances then prevailing both prior to and throughout the class period, a prudent fiduciary should have considered peer comparison.[6]

56. Accordingly, a prudent plan fiduciary, when determining whether to retain a Target Date Fund series, would evaluate and compare the performance and commonly accepted investment performance metrics such as the ones identified above to meaningful benchmarks including at the very minimum the industry leading alternative target date options.

57. Prior to and throughout the class period prudent plan fiduciaries had access to a tremendous amount of information to evaluate the performance of the AC TDF series in comparison to the industry leading alternative options.

58. Additionally, the prudent evaluation process requires an evaluation of all various "preferences" with respect to various target date fund series. In other words, the selection of a "through" versus a "to" TDF series or an "active" versus a "passive" TDF series is a fiduciary decision in and of itself. Similarly, the selection of a TDF series incorporates and requires the selection of the glide path of that TDF series which is also a separate fiduciary decision in and of itself. Arbitrary limitation to only consider "to" or "through" options, or only "active" and not "passive" is imprudent.

59. For instance, hypothetically, if all "passive" TDF series consistently underperformed all "active" TDF series then it would be imprudent to limit the selection process

---

[6] See, Callan Institute, Defined Contribution Trends Surveys 2017-2020, 2022.

to "passive" options because there may be something inherently imprudent in the universe of "passive" options. The same goes for choosing a "to" TDF series versus a "through" series. Moreover, there is a lot of overlap in the glide paths of "to" versus "through" glide paths and since many of the categorizations are arbitrary, a prudent fiduciary would consider the entire universe of TDFs as opposed to a limited subset.

60.     Accordingly, a prudent plan fiduciary is required to evaluate not only whether a particular preference is prudent under the circumstances then prevailing but also whether specific options that incorporate or do not incorporate those preferences are prudent. In other words, a prudent plan fiduciary would be required to conduct an evaluation of the differences between various preferences to determine and ensure that those preferences were, in fact, prudent.

61.     Practically speaking, prior to and throughout the class period, in this market with limited options, a prudent plan fiduciary would always consider and compare, at a minimum, the Capital American Target Retirement Series (also known as "American Funds"), the Vanguard Target Retirement Series, the T. Rowe Price Target Series, and the BlackRock LifePath Index series with any other potential TDF series because these have consistently outperformed most alternatives when evaluated by prudent MPT process and are accordingly, among the most often selected TDF options. *See* Paragraph 43, above.

### C.  *The Committee's Own Monitoring Framework Exposed the AC TDF's Failures, and the Committee Chose Not to Act*

62.     The AC TDF was the dominant investment in the Plan throughout the relevant period. As of April 23, 2020, nearly four-fifths (78%) of the Plan's $72 million in total assets were held in the AC TDF on behalf of thousands of Plan participants. By June 2025, the AC TDF still comprised more than two-thirds (67.41%) of Plan assets, approximately $139 million of the Plan's $206 million in total assets. Despite this concentration, the Committee employed a flawed process

18

for monitoring the AC TDF and treated it as a selection that required no independent evaluation, and *less* scrutiny than its other investment options.

63.     To start, the Committee reviewed Plan performance less than quarterly during the relevant period. From Q1 2018 through Q3 2025 (approximately 31 quarters or seven and a half years), the Committee held 17 meetings, an average of roughly two meetings per year. Multiple gaps of nine to ten months occurred between consecutive meetings. ERISA's duty of prudence requires fiduciaries to monitor plan investments at "regular intervals." *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015) (quoting A. Hess, G. Bogert, & G. Bogert, Law of Trusts and Trustees § 684, pp. 147-48 (3d ed. 2009) (Bogert 3d)). The industry uniformly recognizes that meeting at least quarterly to review investments is part of a prudent monitoring process.[7] The Committee's irregular meeting schedule reduced the opportunities to identify and act on the AC TDF's persistent underperformance and further contributed to the absence of any TDF-specific evaluation during the relevant period.

64.     When the Committee did meet, it failed to apply a prudent process—and even failed to apply its own processes.

65.     The Committee's Investment Policy Statement ("IPS") established a quantitative framework for evaluating the Plan's investments. The IPS used a methodology rating each fund across ten equally weighted criteria: three- five- and ten-year trailing returns versus the peer group median, five-year Alpha, Sharpe Ratio, Upside Capture, and Downside Capture versus peer group thresholds, three- five- and ten-year outperformance versus the benchmark index; plus two additional criteria (one-year return and expense ratio) weighted at 0%. Each criterion was scored

---

[7] *See* Mercer, *A Guide to Defined Contribution Fiduciary Committee Governance*, Mercer (May 22, 2025), https://www.mercer.com/en-us/insights/retirement/defined-contribution-plans/a-guide-to-fiduciary-committee-governance/.

pass or fail, and the weighted passes were summed to a Criteria Score on a 100-point scale. A score of 62 or above earned "Maintain" status. A score below 62 triggered "Watch" status. A fund that remained on Watch for four or more consecutive quarters was escalated to "Decision Needed," requiring a Committee vote on whether to replace the fund.

66.     MMA's quarterly investment reports contained an "Investment Policy Monitoring Report" section that applied this framework to every fund in the Plan. For each fund, the report displayed all twelve criteria metric values, color-coded green (pass) or red (fail) against the peer group threshold, a computed Criteria Score, and a monitoring Status designation (Maintain, Watch, or Decision Needed). The same reports contained a separate "Target Date Funds Criteria" section that displayed the identical twelve metric values for each AC TDF vintage, with the same green/red pass/fail color coding. The quarterly reports computed these values automatically for every **non-TDF** fund. All the data necessary to score each AC TDF vintage under the IPS criteria appeared in every quarterly report, but scores were not calculated and statuses were not assigned except for the few occasions discussed below.

67.     In Q1 2018 and Q2 2018, MMA's reports actually computed IPS Criteria Scores for each AC TDF vintage. The results were stark. In Retirement scored 80, a passing score. But every other vintage scored between 30 and 50, well below the 62-point threshold that would trigger Watch status for any other fund in the Plan. Despite these failing scores, the Status column for every AC TDF vintage read "-", a dash, rather than "Watch" or "Decision Needed." By Q1 2019, the scores had deteriorated further: the 2020 vintage scored 20 out of 100; the 2025 vintage scored 20; the 2030 through 2045 vintages scored 30; the 2050 vintage scored 40; and the 2055 vintage scored 50. The Status designation had changed from a dash to "Not Rated", an acknowledgment that the Committee chose not to rate these funds notwithstanding their failing scores.

68.    The following table sets forth the IPS monitoring scores for each AC TDF vintage for every quarter in which a quarterly investment report is available, from Q1 2018 through Q3 2025. Scores shown in italic were computed by Plaintiff from the metric data contained in the Committee's own quarterly reports, applying the Committee's own IPS criteria and weighting.[8] Scores shown in regular text were provided in the reports themselves. Red shading indicates a score below the threshold (62 until Q3 2023, after which the threshold dropped to 60 under the One View scheme), which would have triggered Watch status for any other fund. Green shading indicates a passing score. Gray cells indicate quarters in which the Committee did not meet and/or a quarterly investment report is unavailable.

| Quarter | AC In Ret | AC 2020 | AC 2025 | AC 2030 | AC 2035 | AC 2040 | AC 2045 | AC 2050 | AC 2055 | Series AVG |
|---------|-----------|---------|---------|---------|---------|---------|---------|---------|---------|------------|
| 1Q18 | 80 | 50 | 50 | 40 | 30 | 30 | 30 | 30 | 30 | 41.1 |
| 2Q18 | 70 | 40 | 40 | 40 | 30 | 30 | 30 | 30 | 30 | 37.8 |
| 3Q18 | *100* | *40* | *30* | *30* | *30* | *40* | *40* | *80* | *50* | 48.9 |
| 4Q18 | NR | NR | NR | NR | NR | NR | NR | NR | NR | NR |
| 1Q19 | 80 | 20 | 20 | 30 | 30 | 30 | 30 | 30 | 20 | 32.2 |
| 2Q19 | *80* | *20* | *30* | *30* | *30* | *30* | *50* | *50* | *50* | 41.1 |
| 3Q19 | *100* | *40* | *30* | *30* | *30* | *40* | *40* | *80* | *50* | 48.9 |
| 4Q19 | NR | NR | NR | NR | NR | NR | NR | NR | NR | NR |
| 1Q20 | *40* | *10* | *10* | *20* | *50* | *60* | *70* | *70* | *75* | 45.0 |
| 2Q20 | NR | NR | NR | NR | NR | NR | NR | NR | NR | NR |
| 3Q20 | *75* | *50* | *62* | *40* | *50* | *50* | *60* | *60* | *62* | 56.6 |
| 4Q20 | NR | NR | NR | NR | NR | NR | NR | NR | NR | NR |
| 1Q21 | *75* | N/A | *62* | *38* | *38* | *38* | *38* | *50* | *62* | 50.1 |
| 2Q21 | NR | NR | NR | NR | NR | NR | NR | NR | NR | NR |
| 3Q21 | NR | NR | NR | NR | NR | NR | NR | NR | NR | NR |
| 4Q21 | 88 | N/A | 62 | 62 | 38 | 38 | 38 | 38 | 38 | 50.3 |
| 1Q22 | NR | NR | NR | NR | NR | NR | NR | NR | NR | NR |

[8] Where the Committee's reports displayed the IPS criteria metric data for AC TDF vintages but did not compute a Criteria Score, Plaintiff has computed the score by applying the Committee's own published IPS criteria weighting to the pass/fail data contained in the reports. Report-provided scores are shown in regular text. Computed scores are shown in italics.

| 2Q22 | NR | NR | NR | NR | NR | NR | NR | NR | NR | NR |
|---|---|---|---|---|---|---|---|---|---|---|
| 3Q22 | 88 | N/A | 75 | 50 | 38 | 38 | 50 | 62 | 62 | 57.9 |
| 4Q22 | NR | NR | NR | NR | NR | NR | NR | NR | NR | NR |
| 1Q23 | 88 | N/A | 75 | 50 | 38 | 38 | 38 | 50 | 50 | 53.4 |
| 2Q23 | NR | NR | NR | NR | NR | NR | NR | NR | NR | NR |
| 3Q23 | NR | NR | NR | NR | NR | NR | NR | NR | NR | NR |
| 4Q23 | 85 | N/A | 81 | 53 | 53 | 45 | 53 | 53 | 53 | 59.5 |
| 1Q24 | NR | NR | NR | NR | NR | NR | NR | NR | NR | NR |
| 2Q24 | 45 | N/A | 35 | 30 | 30 | 30 | 30 | 30 | 30 | 32.5 |
| 3Q24 | NR | NR | NR | NR | NR | NR | NR | NR | NR | NR |
| 4Q24 | 50 | N/A | 40 | 30 | 20 | 20 | 20 | 20 | 20 | 27.5 |
| 1Q25 | 78 | N/A | 39 | 39 | 39 | 39 | 39 | 45 | 45 | 45.4 |
| 2Q25 | NR | NR | NR | NR | NR | NR | NR | NR | NR | NR |
| 3Q25 | 86 | N/A | N/A | 39 | 39 | 39 | 39 | 45 | 45 | 47.4 |

69.     As the above table demonstrates, the series never passed muster. The AC TDF 2035 and 2040 vintages never achieved a passing score in any quarter for which data is available. The 2030 vintage achieved a passing score in only one quarter (Q4 2021, score 62, the bare minimum) and failed in every other quarter. The 2045 vintage achieved a passing score in only one quarter (Q1 2020, score 70). The 2025 vintage managed passing scores in some quarters (Q3 2020, Q1 2021, Q4 2021, Q3 2022, Q1 2023, Q4 2023), but fell below threshold in others. The 2050 and 2055 vintages similarly achieved passing scores in a handful of quarters but failed more often than they passed. Only the In Retirement fund consistently achieved passing scores, and even it failed in Q1 2020 (score 40). In sum, across the entire monitoring period, AC TDF series would have been on the watch list during all available quarters and most AC TDF vintages would have been on the Watch list in most quarters, had the Committee bothered to rate them.

70.     The AC One Choice 2035 vintage illustrates the depth of this failure. It never achieved a passing score in any quarter for which data is available. Its highest score under the IPS framework was 53. It failed every quarterly evaluation throughout the relevant period. Had the Committee applied its IPS criteria, the 2035 vintage would have been placed on the Watch list no

later than Q4 2018 and escalated to Decision Needed by Q3 2019. The Committee never placed it on the watch list and took no action.

72. The AC One Choice 2040 vintage followed the same pattern. It never passed a quarterly evaluation, achieving at most a score of 60 in Q1 2020. Had the IPS criteria been applied, it would have been on the Watch list continuously from Q1 2018 forward. The Committee never placed it on the watch list and took no action.

72. The AC One Choice 2030 vintage passed in only one quarter during the entire period (Q4 2021, with a bare-minimum score of 62). It failed 10 of 11 quarterly evaluations and never achieved four consecutive passing quarters. Under the IPS framework, it would have remained on the Watch list for most of the period, qualifying for escalation to Decision Needed multiple times. The Committee never placed it on the Watch list or otherwise acted on this pattern.

73. The AC One Choice 2045 vintage passed in only one quarter (Q1 2020, score 70). It failed 10 of 11 quarterly evaluations. That single passing quarter does not break the pattern of persistent failure that would have required the Committee to place it on the Watch list under its own procedures.

74. The AC One Choice 2050 and 2055 vintages each passed only 4 of 11 quarterly evaluations, failing more often than they passed. While less severe than the 2035 and 2040 vintages, both experienced multiple stretches of four or more consecutive failing quarters, each of which would have triggered Watch list placement and eventual escalation to Decision Needed had the Committee applied its own IPS criteria.

75. Even the 2025 vintage failed 5 of 11 quarterly evaluations, and several of its passing scores were at exactly 62, the bare minimum. Only the In Retirement vintage passed more often than not (9 of 11 quarters), though even it failed in Q1 2020 (score 40) and should have been placed

23

on the Watch list—it was not. That the IPS framework could distinguish between stronger and weaker performers within the same TDF series only underscores the Committee's failure to use the framework for its purpose.

76.    In short, under the Committee's own IPS criteria: the 2035 and 2040 vintages were never placed on a Watch list despite failing in every available quarter; the 2030 and 2045 vintages were never placed on a Watch list despite failing in all but one quarter; and no AC TDF vintage ever experienced a sustained period of passing scores that would have kept it off the Watch list. Had the Committee applied to the AC TDFs the same IPS framework it applied to every other fund, most vintages would have been on the Watch list from Q1 2018 onward and would never have come off it.

77.    Despite this data, the Committee never assigned a monitoring status to any AC TDF vintage. Not once. In every quarterly report from Q3 2017 through Q1 2025, across more than twenty quarterly reviews spanning two distinct monitoring methodologies, every AC TDF vintage was designated "Not Rated."

78.    The designation "Not Rated" appears for every AC TDF vintage in every quarter. Every other fund in the Plan received a computed score and a monitoring status designation (Maintain, Watch, or Decision Needed). The AC TDFs, which held the majority of Plan assets as the QDIA, were the only funds consistently exempted from this framework.

79.    The Committee's differential treatment of the AC TDFs is starkly illustrated by comparing the Committee's response to other funds with similar or higher scores. In Q1 2019, Pioneer Fundamental Growth Y scored 40 under the IPS criteria. It received "Decision Needed" status after two quarters with such status (and three quarters on the Watch list before that) and was replaced with AB Large Cap Growth I (which scored 100). In the same quarter, Voya MidCap

24

Opportunities I scored 40 after three quarters on the Watch list. It too received "Decision Needed" status. In Q1 2020, Pioneer Bond K scored 0 and was placed on the Watch List. In that same quarter, the AC One Choice 2025 vintage scored 20, less than half the scores that triggered replacement for Pioneer and Voya, but received "Not Rated" and no action was taken. The AC One Choice 2030 vintage scored 30, still below Pioneer's and Voya's scores, and likewise received "Not Rated."

80.    The Watch List History Reports confirm this pattern. The Q2 2019 Watch List History Report tracks the monitoring status of every fund in the Plan across eight consecutive quarters, from Q3 2017 through Q2 2019. For every non-TDF fund, the report shows a complete monitoring history: JPMorgan Core Plus Bond received "Maintain" in every quarter; Pioneer Bond received "Maintain" in every quarter; PIMCO Real Return was placed on "Watch" in Q4 2017 before returning to "Maintain"; Pioneer Fundamental Growth escalated from "Maintain" to "Watch" to "Decision Needed" and was replaced; Voya MidCap Opportunities escalated from "Maintain" to "Watch" to "Decision Needed" and was replaced. For every AC TDF vintage, every single one, the report shows "Not Rated" in every single quarter. The Committee simply chose not to apply the monitoring framework to the Plan's largest investment category.

81.    From Q1 2020 through Q3 2022, the pattern shifted but the exemption persisted. MMA's reports continued to include a "Target Date Funds Criteria" section displaying all twelve IPS metric values for each vintage, with green/red pass/fail color coding against peer group thresholds. But the reports no longer computed Criteria Scores for TDFs. *Less* scrutiny, not more. The Criteria Score column was left blank and the Status column continued to read "Not Rated." The Committee had all the data to compute a score, it simply chose not to. When Plaintiff computes the scores from the data in the Committee's own reports using the Committee's own criteria and

25

weighting, the results confirm persistent failure: the 2035 and 2040 vintages scored 38 or below in every available quarter; the 2030 vintage scored between 38 and 62; and only the In Retirement and (intermittently) 2025, 2050, and 2055 vintages achieved passing scores.

82. In June 2023, the Committee adopted a new monitoring methodology called "One View," replacing the IPS framework. One View rates each fund across 27 criteria in three categories: Fund Performance (40%), Fund Characteristics (25%), and Risk-Adjusted Performance (35%). The pass threshold is 60 out of 100. In Q4 2023, when One View scores can be computed from the Fund Scoring Report data, the results show: In Retirement scored 85 (passing); the 2025 vintage scored 81 (passing); but the 2030 through 2055 vintages all scored between 45 and 53, below the 60-point pass threshold. By Q1 2025, the scores had deteriorated further: all vintages except In Retirement (78) scored between 39 and 45, far below threshold. The transition from the IPS to One View changed the methodology but did not change the result: the AC TDF vintages failed under either framework—and triggered zero Committee action.

83. The significance of this failure cannot be overstated. The Committee's own Investment Policy Statement criteria, as adopted in June 2023, place 75% of the total investment evaluation score on performance-related metrics, 40% on fund performance (including peer-relative trailing returns over one-, three-, five-, and ten-year periods) and 35% on risk-adjusted performance (including Alpha, Sharpe Ratio, Sortino Ratio, Information Ratio, Standard Deviation, Beta, and Up/Down Market Capture). The remaining 25% is allocated to fund characteristics such as expense ratio, manager tenure, product history, and style consistency. These are substantially the same metrics Plaintiff relies upon throughout this Complaint to demonstrate the AC TDF's inferiority. **Yet the Committee never applied its own IPS criteria to the Plan's largest and most important investment**. TDFs were carved out of the standard monitoring

framework and exempt from the Watch list and requirement for a formal retention or replacement decision.

84.     Upon information and belief, had the Committee applied its IPS criteria to the AC TDF vintages during the relevant period, as it was obligated to do and as it did for every other fund in the Plan, the performance and risk-adjusted performance data in MMA's quarterly reports would have yielded scores below the watch list threshold in nearly all quarters for most vintages. Had those vintages been placed on the watch list, as any other fund with comparable scores would have been, and had they remained on the watch list for four or more consecutive quarters, *as the data demonstrates they would have*, the Committee would have been required under its own procedures to escalate the AC TDFs to "Decision Needed" status and vote on their disposition, the same process that resulted in the replacement of Pioneer Fundamental Growth, Voya MidCap Opportunities, and eventually Janus Henderson Triton. The Committee's decision to exempt TDFs from this process ensured that no AC TDF vintage would ever be subjected to the scrutiny the Committee applied to every other fund in the Plan.

85.     In sum, for more than eight years, the Committee failed to apply its own processes to the Plan's largest investment. Had it done so, it would have seen the AC TDF's persistent failure to live up to the Committee's own standards, and it would have been required to confront the fact that more prudent investments were available on the market.

### D. Defendants Failed to Follow a Prudent Process for Monitoring the AC TDF Series

86.     Beyond exempting the AC TDFs from the Watch list, the Committee's minutes of the meetings it did have and the corresponding quarterly investment review reports, prepared by Marsh McLennan Agency ("MMA") the Plan's investment consultant and ERISA §3(21) advisor, reveal other failure patterns. From Q1 2018 through at least Q3 2025, MMA's quarterly reports

contained comparative data on alternative TDF providers, including trailing performance comparisons and suitability questionnaires. Yet the Committee never acted on this comparative data; it never directed a formal evaluation of whether the AC TDF should be retained or replaced, never applied the Plan's own IPS monitoring criteria to the AC TDF, and never documented any deliberation on whether the alternatives MMA had identified warranted further consideration.

87. The Committee's investment consultant, MMA, identified the need to "[e]stablish a process for comparing and selecting TDFs" as well as suitable alternative TDF providers as early as 2019 (JP Morgan and John Hancock). The Committee simply failed to do so. MMA reiterated the suitability of both JP Morgan Target Date Funds and MFS Lifetime Funds in Q2 2020 meeting. Despite MMA's identification of these alternatives and the performance data available to the Committee, the Committee never directed a formal retention evaluation of the AC TDF. Despite years of comparative data showing alternatives outperforming the AC TDF on trailing returns, risk-adjusted metrics, and fees, the Committee never deliberated on whether to replace the AC TDF and never documented any analysis of available alternatives.

88. At the same time, the Committee demonstrated that it knew how to conduct a rigorous competitive evaluation, but only applied that process to recordkeeping services, never to the AC TDF. For example, in 2018, the Committee conducted a comprehensive Request for Proposal ("RFP") in which it invited seven vendors (Charles Schwab, Empower, Fidelity, John Hancock, Prudential, T. Rowe Price, and Vanguard) to compete for the Plan's recordkeeping business. The Committee evaluated finalist presentations, negotiated fee reductions, and documented its analysis in detailed meeting minutes. Yet the Committee conducted no analogous competitive evaluation of the AC TDF, the investment holding 65% of participant assets, during the same period or at any point thereafter.

28

89.     In 2024, the Committee conducted a second competitive evaluation but again only for recordkeeping services, a Request for Information ("RFI"), that again excluded any evaluation of the AC TDF. The RFI evaluated five vendors: Fidelity, Empower, Charles Schwab, John Hancock, and T. Rowe Price. The Committee documented detailed pricing comparisons showing that John Hancock offered recordkeeping fees 33% lower than Fidelity's, and T. Rowe Price offered fees 29% lower. The Committee nevertheless voted unanimously *not* to act and for the Plan to remain with Fidelity. This second competitive evaluation, conducted more than six years after the 2018 RFP, again focused exclusively on recordkeeping services and did not include any evaluation of the Plan's target date fund investments, despite the AC TDF's continued underperformance and its status as the Plan's largest investment category.

90.     The Committee consistently deferred to MMA's recommendations without documented analysis. Every time MMA made a recommendation regarding the AC TDF or other Plan investments, the Committee consistently adopted MMA's recommendations without documented independent analysis, even when MMA's own comparative data showed alternatives outperforming the AC TDF on key trailing performance metrics. The meeting minutes contain no evidence that any Committee member questioned whether the AC TDF remained the most prudent option or requested additional analysis of alternative TDF providers.

91.     The first TDF-specific inquiry of any kind did not occur until August 2024. In Q2 2024, MMA distributed a "target date suitability questionnaire" to Committee members. The Committee determined that the AC TDF was "still suitable for Sig Sauer employees" based on the questionnaire alone. This falls woefully short of a prudent process which should have considered MPT metric performance against at least some of not all market leading option in a market where the top 5 TDFs harbor 80% of the invested capital. Further, the questionnaire emphasizes its

worthlessness as a process by finding all three assessed funds (the AC TDF, JP Morgan SmartRetirement, and an MFS alternative) "Suitable." A suitability questionnaire that produces a binary "Suitable/Not Suitable" result for multiple funds does not constitute a prudent retention evaluation for the single most important investment decision in the Plan. When three funds all pass a suitability threshold but one dramatically underperforms the others on trailing returns, risk-adjusted metrics, and fees, a prudent fiduciary must evaluate which option best serves participants, not simply confirm that the incumbent fund is allegedly tolerable based on a questionnaire.

92.    In Q1 2025, the Committee received a presentation on the AC TDF from Bobby Allen, a representative of American Century Investments. Mr. Allen, an employee of the fund's manager, presented on the AC TDF. This was a vendor presentation, not an independent or comparative evaluation. No alternative TDF provider was invited to present. No independent analysis of the AC TDF's performance relative to competitors was conducted. The Committee's only special assessment of the Plan's largest investment, comprising 67% of Plan assets, consisted of a presentation by the fund manager seeking to retain the account. Nevertheless based on that presentation, the Committee was "comfortable with the expense ratios and style consistency" (which are *not* determinative criteria under the IPS) and made no changes to the TDF lineup at a time when if they cared to look at any of the alternative market leading options they would have found glaring underperformance.

93.    The Committee's treatment of another Plan investment, Janus Henderson Triton ("Triton"), further illustrates the Committee's failure to maintain a prudent investment monitoring process overall. The Triton fund was placed on the Plan's watch list on three separate occasions over a five-year period. In Q1 2021, the fund was placed on the watch list for failing to meet the Plan's IPS criteria. By Q3 2022, the fund had been escalated to "Decision Needed" status, the most

serious designation under the Committee's monitoring framework, requiring a committee vote on the fund's disposition. Despite this escalation, the Committee voted to "hold and continue to monitor" the fund on multiple occasions, even after MMA acknowledged the availability of potential replacements. The fund briefly cleared the watch list in Q4 2023, only to return to the watch list in Q1 2024. The fund failed the Plan's IPS criteria in six of seven quarters from Q1 2024 through Q3 2025. It was not replaced until November 2025. That was nearly five years of recurring IPS compliance failures across three separate watch periods.

94.     The Committee's handling of Triton is a microcosm of the Committee's approach to investment monitoring. The watch list process was the Committee's primary tool for identifying and addressing underperforming investments. That process took nearly five years and three separate watch periods to replace a small-cap equity fund that repeatedly failed the Plan's own IPS criteria. **The absence of any comparable monitoring process for the AC TDF is all the more striking. The AC TDF, the Plan's single largest investment, was never placed on the Watch list, never subjected to a "Decision Needed" review, and never evaluated under the Committee's own IPS standards for continued inclusion in the Plan, despite at all times falling below the threshold requiring the same.**

95.     During the relevant period, Plan assets grew from approximately $46.6 million in April 2018 to approximately $241.5 million by November 2025, a more than four-fold increase. As Plan assets grew, the Committee's fiduciary obligations intensified. Larger plans have greater resources to devote to investment oversight, and the absolute dollar impact of any investment underperformance increases proportionally. Yet the Committee's approach to monitoring the AC TDF did not evolve during this period. The only TDF-specific analysis of any kind, the surface

level August 2024 suitability questionnaire, occurred after Plan assets in the AC TDF had already exceeded $193 million.

96.    In sum, the Committee's records establish a consistent pattern of inaction from 2018 through at least 3Q 2025. Throughout this period, the Committee:

(a) never conducted a formal retention evaluation of the AC TDF against alternative TDF providers, despite receiving comparative data showing alternatives with stronger performance;

(b) never commissioned an independent evaluation of whether the AC TDF remained the most prudent option for participants;

(c) knew that suitable alternative TDF providers existed, including JP Morgan, John Hancock, and MFS as identified by MMA in 2019 and 2020, but never evaluated them;

(d) never considered any of the market leading TDFs as options;

(e) conducted two comprehensive competitive evaluations of recordkeeping services but never applied a comparable process to the Plan's largest investment;

(f) received quarterly investment review reports in which nearly all AC TDF vintages received failing IPS scores for nearly all quarters under the Plan's own evaluation standards that would trigger watch list placement for any other fund, and in which the IPS monitoring data, had it been applied to TDFs as it was to every other fund, would have identified persistent failure as early as Q1 2018, yet took no action;

(g) did not examine the whole series performance as a whole under its IPS metrics;

(h) never assigned the AC TDFs a monitoring status under the IPS framework, despite the monitoring reports containing all data necessary to compute scores, and despite those

computed scores falling below the threshold that triggered Watch status, Decision Needed status, and eventual replacement for other funds in the Plan;

(i) received a presentation on the AC TDF from the fund's own manager and did not seek out any objective analysis;

(j) met on average only twice per year;

(k) treated the Plan's watch list process with such leniency that a demonstrably underperforming fund required nearly five years and three separate watch list placements before being replaced. At every point in this period and before this period, the Committee had information indicating that the AC TDF was a problem. At every point, it did nothing.

97.     For several years prior to and continuing throughout the class period, the AC TDF has consistently underperformed alternative target date series on the metrics that the Committee's own IPS criteria weight most heavily (the same trailing returns, risk-adjusted performance measures, and fee comparisons that constitute 100% of the IPS scoring framework). Had the Committee applied these metrics to the AC TDF as it did to every other fund, the results, which are set forth in detail below, would have compelled the AC TDF's removal no later than 2020 (as it would have been on the watch list for several quarters already).

98.     The underperformance data set forth below, which was available to the Committee through MMA's quarterly investment review reports, further confirms the imprudence of the Committee's documented failure to evaluate the AC TDF against alternatives. For example, for several years prior to and continuing throughout the class period, the AC TDF has consistently

33

underperformed other prudent target date series options and the alternatives that AC used as a benchmark themselves. [9]

99.    Specifically, under the circumstances prevailing in 2020, when confronted with the information that the AC TDF at the end of 2018 and 2019 had consistently underperformed in 3- and 5-year returns and MPT manager, risk, and cost metrics, no documented evaluation of whether to retain or replace the AC TDF series appears in any Committee record from this period. A prudent fiduciary, had one conducted such an evaluation, would not have decided to continue to retain the AC TDF throughout 2020.

100.    The table below provides a summary of 3- and 5-year investment returns and metrics underperformance compared to industry leading available alternative target date series (described in more detail below) in 2018 and 2019. In both years the 3- and 5-year underperformance of the AC TDF series was around 98%, which shows it had a consistent more than five-year underperformance by the end of 2019 across all metrics (just prior to the start of the class period).

---

[9] It is worth noting that for some time prior to and at least through October 7, 2024, AC compared their TDF series to the American Funds TDF in their marketing materials on their website. As of January 21, 2026, however, they have removed that comparison and now compare to a Fidelity series.  See https://www.americancentury.com/advisors/client-conversations/target-date-solutions/one-choice-target-date-portfolios/ (last viewed January 21, 2026).

**Performance Metrics Comparison Summary January 2018 - December 2019**

| Metric Analyzed | Total # of Metrics Analyzed Against Comparators | # of Metrics AC Underperformed | Percentage of Metrics AC Underperformed |
|---|---|---|---|
| 3 - Year Return | 55 | 55 | 100% |
| 5 - Year Return | 48 | 48 | 100% |
| Sharpe Ratio - 3 - Year | 55 | 55 | 100% |
| Sharpe Ratio - 5 - Year | 48 | 48 | 100% |
| Information Ratio 3 - Year | 55 | 55 | 100% |
| Information Ratio 5 - Year | 48 | 48 | 100% |
| Alpha 3 - Year | 55 | 55 | 100% |
| Alpha 5 - Year | 48 | 48 | 100% |
| Sortino Ratio - 3 - Year | 55 | 55 | 100% |
| Sortino Ratio - 5 - Year | 48 | 48 | 100% |
| Batting Average 3 - Year | 55 | 54 | 98% |
| Batting Average 5 - Year | 48 | 47 | 98% |
| Turnover Ratio | 56 | 46 | 82% |
| **Total** | 730 | 718 | 98% |

101.    Given the underperformance of 718 out of 730 metrics (98%) examining 3- and 5-year lookbacks, the Fiduciaries had no reason to expect AC TDF to improve or outperform during the class period starting in 2020. Unsurprisingly, failure to remove AC TDF in 2020 based on this information resulted in millions of dollars of harm to the Plan.

**Approximate Performance Losses January 2020 - December 2024**

| Target Date Series Name | AC's Approximate Performance Losses ($) vs. Comparators |
|---|---|
| American Funds Target Date Retirement Series R4/R6 | -$6,274,318 |
| Vanguard Target Retirement Series Inv | -$3,867,350 |
| T. Rowe Price Target Series Inv/I | -$3,422,378 |
| BlackRock LifePath Index Instl | -$3,661,130 |

102.    A prudent fiduciary following the standard of care under the circumstances then prevailing in 2020 (examining 2018 and 2019 3- and 5-year lookback data) would have evaluated

35

the AC TDF series against, at a minimum, the investable market leading TDF benchmarks identified above, under the MPT accepted investment metrics set forth below and, regardless of which combination of reasonable benchmarks and metrics chosen, a fiduciary acting under the prudent investor standard under the circumstances then prevailing in 2020, **could not have concluded that it was prudent to continue to retain the AC TDF series** unless they employed a flawed process.

103.    Similarly, the table below illustrates that the details of the AC TDF series underperformance [10] when evaluated using several investment metrics that are commonly used, accepted, and required by MPT and the Prudent Investor Standard. Using these commonly accepted and required metrics for comparison demonstrates that a prudent process would have revealed that the AC TDF series consistent underperformance under all metrics, removed it in early 2020, and avoided the harm caused to the Plan.

104.    A prudent process would have removed the AC TDF prior to the class period—but at the very latest, and most relevant to this action, no later than early 2020. Every single following quarter that the Fiduciaries failed to remove this option was a result of imprudence because the AC TDF series underperformed a shocking 98% of commonly accepted MPT metrics of 3- and 5-year lookbacks in 2020. [11]

105.    The Plan Fiduciaries failed to employ a prudent process for evaluating the AC TDF. As set forth in Section d above, the Committee had a functioning IPS monitoring framework that

---

[10] "Underperformance" in this context includes both commonly accepted investment manager metrics as well as the investment returns.

[11] The most relevant available information back in 2020 was 2019 and 2018 lookback performance.

would have identified the AC TDF's persistent underperformance, but chose not to apply it to TDFs.

106. Compounding this failure, the Committee never evaluated the AC TDF's performance on a series-wide basis—even though a fiduciary's decision to retain or replace a TDF necessarily applies to the entire series, not individual vintages. The Committee's reports listed individual vintage scores but never aggregated them to assess whether the series as a whole warranted continued inclusion. Had the Committee computed a simple series-wide average in any quarter from 2018 through 2025, it would have known the AC TDF would have failed every single time.

107. The underperformance data that follows confirms the consequences of that decision.

108. Moreover, even had Defendants applied their IPS framework to the AC TDF, the framework itself was deficient—it incorporated few, if any, of the commonly accepted MPT metrics required by the prudent investor standard, such as Sharpe ratio, Sortino ratio, alpha, and information ratio. A quantitative framework that omits these foundational risk-adjusted performance metrics cannot satisfy the duty of prudence, regardless of whether it is followed.

109. Regardless of how Defendants might have weighed one category of MPT metrics against another, the conclusion is inescapable: all available information at the time required them to remove the AC TDF and select a better-performing alternative.

110. Yet from 2018 through 2024, Defendants failed to remove the AC TDF series from the Plan, leaving over 65% of Plan assets invested in a demonstrably underperforming and imprudent investment through at least the end of 2024.

111.    Fiduciaries following a prudent process would not have ignored the AC TDF's underperformance across all types of metrics. The comparator TDFs identified in this Complaint, Capital American/American Funds, T. Rowe Price, Vanguard, and BlackRock LifePath Index, are not fringe or unproven options selected for litigation purposes. They are the industry's most widely selected TDF families, collectively holding more than 80% of all TDF assets. MMA itself identified JP Morgan and MFS as suitable alternatives for the Plan. Any fiduciary applying the Committee's own IPS criteria, or following any prudent evaluation process, would have been aware of and compared against these industry leaders.

112.    A prudent process would have uncovered AC TDF's poor performance against established peers. But the Committee did not follow a prudent process and never considered those peers.

113.    To make matters worse, as illustrated below, the AC TDF series was also more expensive in terms of fees, which is a significant consideration under the minimum standard of care prior to and throughout the class period. This means the Fiduciaries agreed to pay more for AC TDF than they would have for better performing options that dramatically outperformed AC TDF under all metrics. This is relevant because additional expenses need to be justified by a reasonable expectation of additional returns, which, given AC TDF's track record, was unreasonable to expect.

114.    Each table below illustrates an analysis of the several of the most important and commonly accepted investment performance metrics incorporated into the Prudent Investor Standard when comparing the AC TDF series to other available alternatives on an annual basis.

115.    In other words, each column of the table represents the circumstances at each calendar year end that the Plan Fiduciaries would have had available to them to compare the AC

38

TDF series to meaningful and available alternative series had they employed a prudent process to determine whether to retain the AC TDF series.

116.    For each metric comparison, if the AC TDF series underperformed more than 50% of the time, the metric is highlighted in red. If, as is rarely the case, the AC TDF series metric underperformed less than 50% of the time, the metric is highlighted in green.

117.    As illustrated below, when compared on a TDF series-to-series basis, the AC TDF series underperformed the Capital American Target Date series under all metrics looking back 3- and 5-years. The chart below demonstrates that in 2020, if the Fiduciaries reviewed AC TDF's performance looking back 3- and 5-years across MPT metrics, they would have found a truly astounding 100% of the time each year under each metric.

**American Century Target Date Series Inv vs American Funds Target Date Retirement Series R4: Percentage of Metrics AC Underperformed**

|  | 2018 | 2019 | Total 2018-2019 |
|---|---|---|---|
| 3 - Year Return | 100% | 100% | 100% |
| 5 - Year Return | 100% | 100% | 100% |
| Sharpe Ratio - 3 - Year | 100% | 100% | 100% |
| Sharpe Ratio - 5 - Year | 100% | 100% | 100% |
| Information Ratio 3 - Year | 100% | 100% | 100% |
| Information Ratio 5 - Year | 100% | 100% | 100% |
| Alpha 3 - Year | 100% | 100% | 100% |
| Alpha 5 - Year | 100% | 100% | 100% |
| Sortino Ratio - 3 - Year | 100% | 100% | 100% |
| Sortino Ratio - 5 - Year | 100% | 100% | 100% |
| Batting Average 3 - Year | 100% | 100% | 100% |
| Batting Average 5 - Year | 100% | 100% | 100% |
| Turnover Ratio | 100% | 100% | 100% |

118.    Similarly, when compared on a series-to-series basis, the AC TDF series underperformed the T. Rowe Price Target Date Series ("TRP") under all metrics at 100% looking back 3- and 5-years, except Turnover. Thus, in 2020, a prudent process would conclude that AC

TDF's advantage in Turnover costs is severely outweighed by dramatic 100% underperformance across all the other MPT metrics.

**American Century Target Date Series Inv vs T. Rowe Price Retirement Series Inv:**
**Percentage of Metrics AC Underperformed**

| | 2018 | 2019 | Total 2018-2019 |
|---|---|---|---|
| 3 - Year Return | 100% | 100% | 100% |
| 5 - Year Return | 100% | 100% | 100% |
| Sharpe Ratio - 3 - Year | 100% | 100% | 100% |
| Sharpe Ratio - 5 - Year | 100% | 100% | 100% |
| Information Ratio 3 - Year | 100% | 100% | 100% |
| Information Ratio 5 - Year | 100% | 100% | 100% |
| Alpha 3 - Year | 100% | 100% | 100% |
| Alpha 5 - Year | 100% | 100% | 100% |
| Sortino Ratio - 3 - Year | 100% | 100% | 100% |
| Sortino Ratio - 5 - Year | 100% | 100% | 100% |
| Batting Average 3 - Year | 100% | 100% | 100% |
| Batting Average 5 - Year | 100% | 100% | 100% |
| Turnover Ratio | 0% | 71% | 36% |

119.    Likewise, the AC TDF series underperformed the Vanguard Target Retirement Series ("Vanguard") under all metrics looking back 3- and 5-years. The chart below demonstrates that in 2020, if the Fiduciaries reviewed AC TDF's performance looking back 3- and 5-years across MPT metrics, they would have found that AC TDF underperformed under all metrics with only two dipping below 100% underperformance (86% and 83% for 2019 BA).

40

**American Century Target Date Series Inv vs Vanguard
Target Retirement Series Inv:
Percentage of Metrics AC Underperformed**

|  | 2018 | 2019 | Total 2018-2019 |
|---|---|---|---|
| 3 - Year Return | 100% | 100% | 100% |
| 5 - Year Return | 100% | 100% | 100% |
| Sharpe Ratio - 3 - Year | 100% | 100% | 100% |
| Sharpe Ratio - 5 - Year | 100% | 100% | 100% |
| Information Ratio 3 - Year | 100% | 100% | 100% |
| Information Ratio 5 - Year | 100% | 100% | 100% |
| Alpha 3 - Year | 100% | 100% | 100% |
| Alpha 5 - Year | 100% | 100% | 100% |
| Sortino Ratio - 3 - Year | 100% | 100% | 100% |
| Sortino Ratio - 5 - Year | 100% | 100% | 100% |
| Batting Average 3 - Year | 100% | 86% | 93% |
| Batting Average 5 - Year | 100% | 83% | 92% |
| Turnover Ratio | 100% | 100% | 100% |

120.    In that same vein, the AC TDF series underperformed the BlackRock LifePath Index Target Retirement Series ("BlackRock") under all metrics looking back 3- and 5-years. Here also, the chart below demonstrates that in 2020, if the Fiduciaries reviewed AC TDF's performance looking back 3- and 5-years across MPT metrics, they would have found an astonishing 100% underperformance across the board, except for slightly below 100% underperformance (86%) for 2018 Turnover Ratio.

**American Century Target Date Series Inv vs BlackRock
LifePath Index Instl:
Percentage of Metrics AC Underperformed**

|  | 2018 | 2019 | Total 2018-2019 |
|---|---|---|---|
| 3 - Year Return | 100% | 100% | 100% |
| 5 - Year Return | 100% | 100% | 100% |
| Sharpe Ratio - 3 - Year | 100% | 100% | 100% |
| Sharpe Ratio - 5 - Year | 100% | 100% | 100% |
| Information Ratio 3 - Year | 100% | 100% | 100% |
| Information Ratio 5 - Year | 100% | 100% | 100% |
| Alpha 3 - Year | 100% | 100% | 100% |
| Alpha 5 - Year | 100% | 100% | 100% |
| Sortino Ratio - 3 - Year | 100% | 100% | 100% |
| Sortino Ratio - 5 - Year | 100% | 100% | 100% |
| Batting Average 3 - Year | 100% | 100% | 100% |
| Batting Average 5 - Year | 100% | 100% | 100% |
| Turnover Ratio | 86% | 100% | 93% |

121.     This dramatic level of underperformance compared to industry leading available alternatives, under the circumstances then prevailing in 2020, under accepted MPT metrics, would have mandated a prudent fiduciary to remove the AC TDF in 2020.  Yet the Committee's meeting minutes reflect no discussion of this underperformance in relation to TDF alternatives at any meeting from 2018 through 2024.

122.     The series-level underperformance alone compelled removal of the AC TDF. But a prudent process would also have conducted vintage-to-vintage analysis, which confirms the same conclusion. The tables below illustrate the significant underperformance of each comparable vintage from 2020 through 2024 and the resulting harm to Plan assets.[12] Vintage to vintage comparison also categorically supports AC TDF removal by 2020 the latest.

---

[12] See Exhibit A for detailed vintage to vintage comparison

42

123. In other words, prudent fiduciaries utilizing a prudent process incorporating commonly accepted performance evaluation metrics required by MPT would not have retained the AC TDF series in 2020.

124. In sum, a prudent process would have evaluated the AC TDF against the available industry-leading alternatives. Any such comparison leads to only one prudent conclusion: to remove the AC TDF in 2020 because it provided no advantages against available alternatives in 3- and 5-year lookbacks in multiple years. The Committee's meeting minutes confirm that Defendants did not employ a prudent process in monitoring their TDFs. No TDF comparative analysis was conducted from 2018 through 2024. No TDF-specific evaluation appears in any meeting minutes during this period.

125. The AC TDF series, expectedly based on its historical metrics, underperformed in all comparable vintage years from 2030 to 2060 with regard to returns.

126. Each of the comparable AC TDF series vintages also underperformed when evaluated by the commonly accepted MPT metrics (Sharpe, Sortino, Alpha, etc.). Exhibit A to this complaint sets forth the comparison of every comparable vintage of the AC TDF series to the same vintage for available industry leading alternative TDF series options, broken down by performance as compared to the commonly accepted MPT metrics.

127. The standard of care for selection and monitoring investments for a plan the size of the Plan would require quarterly reviews of the investment performance of selected options. Accordingly, the Plan Fiduciaries would have had a minimum of four opportunities (each quarter in 2019) to remove the AC TDF series based on the 2018 performance and by the Q1 2020 quarterly meeting the Plan Fiduciaries would have had metrics for all of 2018 and 2019 providing the absolute latest time by which the AC TDF series should have been removed.

128.    For each AC TDF vintage, the first table in Exhibit A provides the investment metrics identified throughout this complaint for the two years immediately preceding the class period, which was the most up to date data available to the fiduciaries in 2020. If the AC TDF series vintage underperformed, then the metric is highlighted in red. If the AC TDF series vintage outperformed, the metric is highlighted in green and ties are left white. 2030 vintage comparison against American Funds from Exhibit A set forth below.

### American Century One Choice 2030 Inv

| | 2018 | 2019 |
|---|---|---|
| 3 - Year Return | 4.49% | 8.33% |
| 5 - Year Return | 3.83% | 5.94% |
| Sharpe Ratio - 3 - Year | 0.533 | 0.953 |
| Sharpe Ratio - 5 - Year | 0.496 | 0.704 |
| Information Ratio 3 - Year | -1.237 | -1.478 |
| Information Ratio 5 - Year | -0.370 | -0.856 |
| Alpha 3 - Year | -1.02% | -0.71% |
| Alpha 5 - Year | -0.05% | -0.43% |
| Sortino Ratio - 3 - Year | 0.733 | 1.406 |
| Sortino Ratio - 5 - Year | 0.724 | 1.077 |
| Batting Average 3 - Year | 0.306 | 0.333 |
| Batting Average 5 - Year | 0.433 | 0.417 |
| Turnover Ratio | 16.00 | 20.00 |
| Net Expense Ratio | 0.79% | 0.78% |

129.    The second table provides the investment metrics for the comparable vintage benchmark and, as above, if the comparable vintage benchmark outperformed the AC TDF series benchmark, then the metric is highlighted in green, with underperformance highlighted in red and ties left white. 2030 vintage comparison against American Funds from Exhibit A set forth below.

**American Funds 2030 Trgt Date Retire R4**

| RDETX | 2018 | 2019 |
|---|---|---|
| 3 - Year Return | 6.53% | 10.47% |
| 5 - Year Return | 5.26% | 7.71% |
| Sharpe Ratio - 3 - Year | 0.728 | 1.113 |
| Sharpe Ratio - 5 - Year | 0.594 | 0.811 |
| Information Ratio 3 - Year | 0.195 | 0.312 |
| Information Ratio 5 - Year | 0.545 | 0.290 |
| Alpha 3 - Year | 0.33% | 0.55% |
| Alpha 5 - Year | 0.75% | 0.42% |
| Sortino Ratio - 3 - Year | 1.056 | 1.683 |
| Sortino Ratio - 5 - Year | 0.913 | 1.276 |
| Batting Average 3 - Year | 0.611 | 0.611 |
| Batting Average 5 - Year | 0.600 | 0.583 |
| Turnover Ratio | 8.00 | 0.00 |
| Net Expense Ratio | 0.36% | 0.37% |

130.    And finally, the third table provides the difference for each performance metric, with AC TDF series vintage underperformance highlighted in red, outperformance in green, and ties also left green. 2030 vintage comparison against American Funds from Exhibit A set forth below.

**American Century One Choice 2030 Inv & American Funds 2030 Trgt Date Retire R4 Comparison**

| | 2018 | 2019 |
|---|---|---|
| 3 - Year Return | 2.03% | 2.14% |
| 5 - Year Return | 1.43% | 1.77% |
| Sharpe Ratio - 3 - Year | 0.195 | 0.161 |
| Sharpe Ratio - 5 - Year | 0.098 | 0.108 |
| Information Ratio 3 - Year | 1.432 | 1.790 |
| Information Ratio 5 - Year | 0.915 | 1.146 |
| Alpha 3 - Year | 1.35% | 1.26% |
| Alpha 5 - Year | 0.80% | 0.85% |
| Sortino Ratio - 3 - Year | 0.323 | 0.277 |
| Sortino Ratio - 5 - Year | 0.189 | 0.200 |
| Batting Average 3 - Year | 0.306 | 0.278 |
| Batting Average 5 - Year | 0.167 | 0.167 |
| Turnover Ratio | -8.00 | -20.00 |
| Net Expense Ratio | -0.43% | -0.41% |
| # of Underperforming Metrics | 14 | 14 |
| # of Total Metrics | 14 | 14 |
| % of Underperforming Metrics | 100% | 100% |

131. As the 2030 comparison example demonstrates, AC TDF 2030 underperformed the American Funds 2030 in all metrics in both 2018 and 2019, which represent the data available to the Fiduciaries in 2020.

132. Exhibit A to this complaint provides the same charts demonstrating underperformance across the industry leading comparator TDFs across the 2030-2060 vintages.

133. Thus, had the Committee followed a prudent process, including the comparative analyses it was obligated to conduct but never performed, it would have determined upon reviewing all the information set forth above that it was imprudent to continue to retain the AC TDF series and would have removed it.

134. The Plan fiduciaries had access to metrics and performance data demonstrating that the AC TDF series was underperforming and should be evaluated for removal. This information appeared in the Committee's own quarterly investment reports. Under the IPS monitoring framework, that same data would have triggered Watch status, escalation to "Decision Needed," and ultimately replacement under the Committee's established procedures. Despite this, the Plan Fiduciaries failed to remove the AC TDF series prior to the class period. They also retained the fund in 2020 and continued to retain it through at least Q3 2025. At no point during this period was the Plan's TDF ever subjected to any formal retention evaluation, despite the committee's own scoring framework indicating failure.

135. As a direct result of this conduct, the Plan Participants have suffered investment losses of millions of dollars.

## CLASS ACTION ALLEGATIONS

136. Plaintiff brings this action on behalf of himself and the Class, which is defined as participants in and beneficiaries of the Plan but excluding Defendants; any person who was or is

46

an officer, director, employee, or a shareholder of 5% or more of the equity of Sig Sauer or is or was a partner, officer, director, or controlling person of Sig Sauer; the spouse or children of any individual who is an officer, director or owner of 5% or more of the equity of Sig Sauer; Plaintiff's counsel; judges of the Court in which this case is pending and their current spouse and children; and the legal representatives, heirs, successors and assigns of any such excluded person.

137.    The Class Period includes the six years prior to the date of the filing of this Complaint through the date of judgment.

138.    The members of the Class are so numerous, consisting of thousands of members, not including their spouse beneficiaries, who, upon information and belief, are sufficiently dispersed geographically such that joinder of all members is impracticable. The issues of liability are common to all members of the Class and are capable of common answers as those issues.

139.    Plaintiff's claims are typical of the claims of other members of the Class because their claims arise from the same events, practices and/or courses of conduct described above.

140.    Plaintiff's claims are also typical of the claims of other members of the Class because the relief sought consists of requiring Defendants to make the Plan whole for any losses caused by their fiduciary breaches and to disgorge their profits to the Plan. Any such recovery from Defendants will be paid to the Plan and any relief will flow to all Class Members through their accounts in the Plan.

141.    Plaintiff will fairly and adequately represent and protect the interests of the Class.

142.    Plaintiff does not have any interests antagonistic to or in conflict with those of the Class.

143.    Defendants have no unique defenses against Plaintiff that would interfere with Plaintiff's representation of the Class.

144. Plaintiff is represented by counsel experienced in prosecuting ERISA class actions and with particular experience and expertise in litigation involving ERISA breaches of fiduciary duty.

145. The requirements of Fed. R. Civ. P. 23(b)(1)(A) are satisfied. Fiduciaries of ERISA-covered plans have a legal obligation to act consistently with respect to all similarly situated participants and to act in the best interests of the Plan and its participants. This action challenges whether Defendants acted consistently with their obligations under ERISA as to the Plan as a whole. As a result, prosecution of separate actions by individual members would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct relating to the Plan.

146. The requirements of Fed. R. Civ. P. 23(b)(1)(B) are also satisfied. Administration of an ERISA-covered plan requires that all similarly situated participants be treated the same. Resolving whether Defendants fulfilled their fiduciary obligations to the Plan would, as a practical matter, be dispositive of the interests of the other participants in the Plan even if they are not parties to this litigation and would substantially impair or impede their ability to protect their interests if they are not made parties to this litigation by being included in the Class.

147. The requirements of Fed. R. Civ. P. 23(b)(2) are satisfied as to the Class because Defendants have acted and/or failed to act on grounds generally applicable to the Class, making declaratory and injunctive relief appropriate with respect to the Class as a whole. This action challenges whether Defendants breached their fiduciary duties, which would be violations of ERISA as to the Plan as a whole and as to the Class as a whole. The relief sought in this case primarily consists of declarations that Defendants breached their fiduciary duties. As ERISA is

based on trust law, any monetary relief consists of equitable monetary relief that would either flow directly from the declaratory or injunctive relief or flow as a necessary consequence of that relief.

148.    The requirements of Fed. R. Civ. P. 23(b)(3) are also satisfied. The common questions of law and fact concern whether Defendants breached their fiduciary duties to the Plan. As the members of the Class were participants in that Plan, their accounts were affected by those breaches and violations. Common questions related to liability will necessarily predominate over any individual questions precisely because Defendants duties and obligations were uniform to all participants and therefore all members of the Class. As relief and any recovery will be on behalf of the Plan, common questions as to remedies and damages will likewise predominate over any individual issues.

149.    A class action is a superior method to other available methods for the fair and efficient adjudication of this action. As the claims generally are brought on behalf of the Plan, resolution of the issues in this litigation will be efficiently resolved in a single proceeding rather than multiple proceedings and each of those individual proceedings could seek recovery for the entire Plan. Class certification is a superior method of proceeding because it will obviate the need for unduly duplicative litigation which might result in inconsistent judgments about Defendants' duties with regard to the Plan.

150.    Class action status is warranted under Rule 23(b)(3) because questions of law or fact common to the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

49

**PLAN-WIDE RELIEF**

151.    ERISA authorizes any participant or beneficiary of the Plan to bring an action on behalf of the Plan to enforce a breaching fiduciary's liability to the Plans under 29 U.S.C. § 1109(a). *See* 29 U.S.C. § 1132(a)(2).

152.    Indeed, ERISA fiduciary obligations are defined "with respect to a plan," and fiduciary breaches that impair plan assets are actionable under § 502(a)(2) whether they "diminish[] plan assets payable to all participants and beneficiaries, or only to persons tied to particular individual accounts." *LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 255 (2008).

153.    Plaintiff here seeks relief on behalf of the Plan, *i.e.*, in this case for all losses to the Plan caused by Defendants' breaches, and not only the losses to his individual account.

**TIMELINESS**

154.    Within the six-year period prior to Plaintiff filing this suit, Defendants violated one or more of their fiduciary obligations as described above.

155.    At all relevant times during the Class Period, Defendants also made affirmative misrepresentations to participants about the security of their investments, the competence of the portfolio fund managers, the performance history of their investments, and the amount of investment fees they were being charged.

156.    At all relevant times during the Class Period, Defendants intentionally concealed their fiduciary breaches to prevent Plan participants from discovering them and avoiding the need to cure the deficiencies.

157.    Plaintiff did not acquire actual knowledge of these violations until shortly before commencing this action. Consequently, Plaintiff's claims in this action are timely under 29 U.S.C. § 1113.

### COUNT I: Breach of Fiduciary Duty of Prudence
### (Against Defendants)

158.    Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

159.    At all relevant times, the Defendants were named and/or de facto fiduciaries of the Plan within the meaning of ERISA insofar as they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets. 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

160.    ERISA mandates that fiduciaries act with prudence in the disposition of Plan assets and selection and monitoring of investments. 29 U.S.C. § 1104(a)(1)(B).

161.    During the class period, Defendants had a fiduciary duty to do all of the following: manage the assets of the Plan prudently and act with the care, skill, diligence, and prudence required by ERISA.

162.    At all relevant times during the Class Period, Defendants breached their fiduciary duties of prudence in multiple respects by selecting, failing to adequately monitor, and continuing to retain a severely underperforming TDF option. Specifically, Defendants breached their fiduciary duties by: (a) failing to apply the Plan's own IPS monitoring criteria to the AC TDF, the Plan's single largest investment category, while applying those criteria to every other fund in the Plan; (b) failing to assign any monitoring status to the AC TDF despite the monitoring data demonstrating persistent failure under the IPS criteria; (c) failing to place any AC TDF vintage on the watch list despite scores that, for other funds, triggered Watch status, Decision Needed

51

escalation, and replacement; (d) failing to examine the performance of the AC TDF series as a whole under its IPS metrics; (e) failing to conduct any formal retention evaluation of the AC TDF against alternative TDF providers despite receiving comparative data showing alternatives with stronger performance; (f) failing to consider any of the market-leading target date fund series as alternatives to the AC TDF; (g) failing to commission or seek any independent, objective evaluation of the AC TDF, instead relying solely on a presentation by the fund's own manager; (h) conducting two comprehensive competitive evaluations of the Plan's recordkeeping services during the Class Period while never applying a comparable process to the Plan's largest investment; (i) meeting on average only twice per year to oversee a plan with hundreds of millions of dollars in assets, more than 65% of which was concentrated in the AC TDF; and (j) retaining the AC TDF from 2018 through at least 3Q 2025 while it consistently underperformed established industry alternatives on virtually every accepted investment metric, including trailing returns, risk-adjusted measures, and the Plan's own IPS scoring criteria.

163.    As established by the Committee's meeting minutes and investment review reports, and as further confirmed by the facts set forth in this Complaint, Defendants, as fiduciaries of the Plan, had a continuing duty to regularly monitor and independently assess before and during the Class Period whether the Plan's AC TDF was a prudent choice for the Plan and to remove imprudent investment options regardless of how long those investments had been in the Plan.

164.    During the Class Period, Defendants breached their fiduciary duties of prudence to Plan participants, including Plaintiff, by failing to engage in a prudent fiduciary process for monitoring the Plan's TDF, including by exempting the TDF from the IPS monitoring framework applied to every other fund in the Plan, and by failing to remove the imprudent AC TDF investment within a reasonable period.

165.    Defendants were directly responsible for: evaluating and monitoring the Plan's investment options, including the AC TDF, in a prudent fashion; eliminating funds, such as the AC TDF, that underperformed under all metrics; and taking all necessary steps to ensure that the Plan's assets were invested prudently and appropriately.

166.    Defendants failed to employ a prudent fiduciary process by failing to monitor and evaluate the AC TDF in comparison to other meaningful benchmark TDFs.

167.    Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, thereby breaching their fiduciary duties of prudence under 29 U.S.C. § 1104(a)(1)(B).

168.    As a result of the Defendants' breach of its fiduciary duty of prudence with respect to the Plan, the Plaintiff and Plan participants suffered tens of millions of dollars in unreasonable and unnecessary monetary losses.

169.    Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the fiduciary breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breach of fiduciary duty alleged in this Count. In addition, Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2).

## COUNT II: Failure to Adequately Monitor Other Fiduciaries under ERISA
### (against Sig Sauer)

170.    Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

171.    Sig Sauer had the authority to appoint and remove members or individuals responsible for Plan investment management and was aware that these fiduciaries had critical responsibilities for the Plan.

172.    In light of this authority Sig Sauer had a duty to monitor those individuals responsible for Plan investment management to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

173.    Sig Sauer had a duty to ensure that the individuals responsible for Plan investment management possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Sig Sauer.

174.    Sig Sauer breached its duty to monitor individuals responsible for Plan investment management, by, among other things:

- Failing to monitor and evaluate the performance of individuals responsible for Plan investment management or have a system in place for doing so, standing idly by as the Plan suffered significant losses by maintaining the imprudent AC TDFs for most of the Class Period;

- Failing to ensure that the Committee conducted any TDF-specific comparative analysis during the Class Period, despite the AC TDF comprising over 65% of Plan assets and despite the Committee's own investment consultant having identified suitable alternative TDF providers as early as 2019;

- Failing to monitor the process by which Plan TDFs were evaluated, including by failing to ensure that the Committee applied the Plan's own IPS monitoring criteria to the AC TDF; failing to investigate the availability of alternative, prudent TDFs despite the Committee's own consultant having identified suitable alternatives; and failing to ensure that the Committee acted on the adverse IPS monitoring data contained in its own quarterly reports; and

54

- Failing to remove individuals responsible for Plan investment management whose performance was inadequate in that they continued to maintain the AC TDFs, all to the detriment of the Plan and Plan participants' retirement savings.

175.    As a result of the foregoing breaches of the duty to monitor, the Plaintiff and Plan Participants suffered unreasonable and unnecessary monetary losses amounting to tens of millions of dollars.

176.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor individuals responsible for Plan investment management of the Fiduciaries. In addition, Plaintiff is entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

## PRAYER FOR RELIEF

Wherefore Plaintiff prays that judgment be entered against Defendants on all claims, and requests that the Court order or award the following relief:

A. Certify this action as a class action pursuant to Fed. R. Civ. P. 23, appoint the Plaintiff as class representative, and appoint the firm Milberg, PLLC as class counsel;

B. Order Defendants to disgorge any profits they received as a result of the above breaches of fiduciary duty;

C. Impose a constructive trust over these profits;

D. Impose a monetary surcharge against Defendants and compel Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, including restoring to the Plan all losses resulting from imprudent investment of the Plan's assets in the AC TDFs, restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the Plan participants would have made if the Defendants had

fulfilled their fiduciary obligations by undertaking TDF suitability and comparative analyses on a timely basis;

E. Apportion all amounts recovered for the Plan among the Plaintiff and the Class;

F. Order that any amount to be paid to the Plan and/or accounts of Plaintiff and Class members can be satisfied by using or transferring any breaching fiduciary's account (or the proceeds of that account) to the extent of that fiduciary's liability;

G. Require Defendants to pay attorneys' fees and the costs of this action pursuant to 29 U.S.C. § 1132(g)(1), or order the payment of reasonable fees and expenses to Plaintiff's counsel on the basis of the common benefit or common fund doctrine (or other applicable law) out of any money or benefit recovered for the Class in this action;

H. Award pre-judgment and post-judgment interest;

I. Award any other such relief the Court determines Plaintiff and the Class are entitled to pursuant to 29 U.S.C. § 1132(a); and

J. Award such other relief as the Court may deem just and proper.

DATED: April 10, 2026

Respectfully submitted,

By: */s/ Adam H. Weintraub*
Adam H. Weintraub (# 275047)
**WEINTRAUB LAW, LLC**
170 Commerce Way, Suite 200
Portsmouth, New Hampshire 03801
Telephone: (603) 212-1785
aweintraub@ahwfirm.com

Alexandr Rudenco (*Pro Hac Vice*)
**MILBERG, PLLC**
800 S. Gay St., Suite 1100
Knoxville, TN 37929
Tel: (865) 247-0080
arudenco@milberg.com

*Counsel for Plaintiff and the Prospective Class*